# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

GWEN PRICE, PERSONAL
REPRESENTATIVE OF THE ESTATE
OF JAMES PEREZ, DECEASED,
ET. AL.,                                              No. CV 04-1178-MO

                           Plaintiffs,               OPINION AND ORDER

         v.

JASON SERY, SEAN MACOMBER,
and CITY OF PORTLAND,

                           Defendants.

**MOSMAN, J.,**

        This case arises out of Portland Police Officer Jason Sery's deadly shooting of James

Jahar Perez on March 28, 2004. Gwen Price, on behalf of Mr. Perez's children, and Deborah

Perez (collectively "plaintiffs") sued Officers Sery and Macomber, the two individual officers

involved in the shooting, and the City of Portland ("City") alleging: (1) the officers

unconstitutionally used deadly force for which the City is also liable under *Monell*, (2) the

officers conducted an unconstitutional traffic stop under the Fourth and Fourteenth Amendments,

(3) the officers unconstitutionally applied excessive force with a taser, and (4) a state law claim

for wrongful death based on the negligent acts of the officers and City.[1] Plaintiffs moved for

partial summary judgment asking the court to find that first, Officer Sery lacked probable cause

------

[1] Plaintiffs have withdrawn several claims, including the allegation that Officer
Macomber failed to provide first aid, the *Monell* claims against the City relating to racial
profiling, and subparts 26A, 27A, and 28A of the negligence claim. Pl.s' Resp. Mem. Opp.
Def.s' Motion Summ. J. at 34, 35.

PAGE 1 - OPINION AND ORDER

to shoot Mr. Perez and second, the City's official policy on the use of deadly force is unconstitutional because it allows officers to use deadly force without probable cause. Defendants moved for summary judgment on all of plaintiffs' claims.

At the conclusion of oral argument on December 5, 2005, the court invited the parties to file supplemental briefing on the constitutionality of the City's policy. The supplemental briefing period ended on December 12, 2005. For the reasons stated below, plaintiffs' motion (#89) for partial summary judgment is DENIED, and defendants' motion (#123) for summary judgment is GRANTED IN PART and DENIED IN PART.

I.     STATEMENT OF FACTS

The following facts are undisputed. Portland Police Officers Sery and Macomber were on routine patrol in the St. John's neighborhood of North Portland on Sunday afternoon, March 28, 2004. Macomber Aff. ¶ 3. While executing a left turn onto North Fox Street from North Oswego Avenue (one half block from North Fessenden), Officer Macomber noticed what "appeared to be a luxury sedan." *Id*. ¶ 6. The vehicle was a white 1997 Mitsubishi Diamante with tinted windows and chrome wheels, aftermarket additions that struck Officer Macomber as "not typical for cars driven in that working class neighborhood." *Id*; Swan Inq. p. 56:12. The officers knew the intersection of North Fessenden and North Oswego had been the subject of neighborhood complaints of illegal drug activity. Macomber Aff. ¶ 5.

Officer Macomber drove towards the white sedan, read the license plate to Officer Sery, and asked him to run a registration check. *Id*. ¶ 7. When he was looking through the windshield of the white sedan, Officer Macomber saw two people who "appeared nervous and did not want to make eye contact with me." *Id*. From this initial glance at the passengers, Officer Macomber

thought the driver of the white sedan might be Hispanic.  *Id.* ¶ 11.  The registration check indicated that the white sedan was registered to a man born in the 1950s.  *Id.* ¶ 8; Sery Aff. ¶ 4. Officer Macomber thought the age of the registered owner did not match his estimate of the age of the driver who appeared to be in his twenties.  *Id.*[2]

Officer Macomber turned left onto the street and saw the white sedan stopped at a stop sign.  *Id.* ¶ 9.  The white sedan remained at the stop as the patrol car passed.  *Id.*  This led Officer Macomber to suspect that the driver of the white sedan was waiting to observe the patrol car's direction so that he could drive out of the area without police observing his route.  *Id.*  When the officers reached a position where they could again see the white sedan, the driver was now the sole occupant.  *Id.* ¶ 11.

The officers saw the driver signal a right turn into a strip mall parking lot, but the signal did not comply with Oregon traffic laws requiring vehicles to continuously signal for at least 100 feet prior to executing a turn.  *Id.* ¶ 12; Sery Aff. ¶ 5.  The white sedan pulled into the parking lot and stopped.  Sery Aff. ¶ 6.  Officer Macomber turned on the overhead lights as he followed the white sedan into the parking lot.  *Id.* ¶ 5.  Officer Macomber parked the patrol car directly behind the white sedan, effectively blocking it from any means of exit.  Rosenthal Aff. Ex. 28, p. 1.

From start to finish, that is, from the time the officers got out of their patrol car until the time Mr. Perez was shot, this entire episode lasted between 22 to 24 seconds.  Rhodes Inq. p. 48:16-22.  The parties dispute what transpired after Officer Macomber parked the patrol car.

---

[2] Vital Auto Brokers sold the 1997 Mitsubishi to Mr. Perez on April 14, 2003 for $4,500. Carreira Decl. ¶ 6.  Thus, it is undisputed that Mr. Perez owned this vehicle, but it is also undisputed that he was not the registered owner.

PAGE 3 - OPINION AND ORDER

A.       The Police Officers' Version

After parking directly behind Mr. Perez, the officers simultaneously got out of their patrol car and Officer Macomber approached the driver's side of white sedan while Officer Sery "was hanging back" in the vicinity of its right rear corner.  Macomber Aff. ¶ 14; Sery Inq. Excerpt p. 98.  Through the rear windshield, Officer Sery saw the driver looking back over his right shoulder as the officers approached.  Sery Aff. ¶ 7.  Officer Sery did not know or recognize the driver, nor did he have reason to believe there were any outstanding warrants for the driver's arrest.  Sery Dep. p. 112.

Officer Macomber asked the driver for his license and insurance card, but the driver stated that he did not have a license.  Macomber Aff. ¶ 14. When asked whether he had an I.D. card, the driver's response was "mumbled nonsense," so Officer Macomber repeated his question.  *Id.*  Officer Macomber recalls an "awkward silence" as the two men looked at each other, and the driver did not immediately answer.  *Id.*  The driver then said he did have an I.D. card, and Officer Macomber asked him to produce it.  *Id.*  Officer Macomber saw the driver move his left hand to the door panel and press his power window button to roll up the driver's side window.  *Id.*  Officer Macomber repeatedly ordered the driver to stop rolling up the window, but the driver ignored those commands.  *Id.* ¶ 15.

Due to the tinted windows, Officer Macomber could no longer see inside the car and he started to be concerned for his physical safety.  *Id.*  Officer Macomber opened the driver's side door and saw the driver "leaning over the consol with his back to me," and from his vantage point, he could not see the driver's right hand.  *Id.* ¶¶ 15-16.  Then, the driver looked back over his shoulder at Officer Macomber, and said "I thought you wanted I.D."  *Id.* ¶¶ 16-17.  Officer

PAGE 4 - OPINION AND ORDER

Macomber thought the driver was using his back to conceal or shield from view what he was doing in the console area. *Id.* ¶ 17.

Still concerned for his own physical safety, Officer Macomber moved closer to the door frame and told the driver to put his hands on top of his head. *Id.* Instead of complying, the driver continued concealing what he was doing with his right hand inside the center console that was covered with brown paper napkins. *Id.* The driver appeared to be trying to retrieve a concealed item under the napkins. *Id.* ¶ 18. Officer Macomber grabbed the driver's left wrist and elbow and placed them in an "arm bar" hold. *Id.* The driver resisted these efforts by trying to pull his left arm inside the car. *Id.* Again, Officer Macomber ordered the driver to place his hands on his head. *Id.*

When the driver looked up at him, Officer Macomber thought the driver was trying "to acquire a target" as though "he was considering shooting me." *Id.* To prevent the driver from acquiring him as a target, Officer Macomber used the palm of his hand to turn away the driver's face. *Id.* At that point, Officer Macomber saw the driver "feverishly digging for something" in his right front pocket with his right hand. *Id.* The right pocket appeared to contain a bulge of some sort, and Officer Macomber thought the driver was "going for a weapon." *Id.* This prompted Officer Macomber to push the driver forward in the front seat to make it more difficult for the driver to bring his right arm out around his body to an angle from which he could shoot. *Id.*

Officer Sery was standing near the right rear corner of the white sedan when Officer Macomber first made contact with the driver. Sery Aff. ¶ 6. Officer Sery could not hear the conversation, but he observed the driver roll up his driver's side window, and heard Officer

Macomber order the driver to get his hands in view. *Id*. ¶ 7. In Officer Sery's view, it was "apparent that something was wrong," so he circled back towards the driver's side where he saw Officer Macomber open the driver's side door and put the driver's left arm in a hold. *Id*. ¶ 8. From his vantage point at this time, Officer Sery could see only "a portion of the driver's head and the left side of his body." *Id*. Officer Sery could not see everything that transpired between the driver and Officer Macomber, as Officer Macomber's body partially blocked Officer Sery's view of the passenger compartment. Defendants do not dispute the fact that Officer Sery did not see Mr. Perez brandish a weapon, nor did he see drugs or drug paraphernalia prior to shooting Mr. Perez. Sery Dep. p. 112.

Officer Sery recalled that after grabbing the driver's arm, Officer Macomber released his grasp and yelled "Get your hand out or you're gonna get tased." Sery Aff. at ¶ 9. It is at this point that Officer Sery unholstered his weapon and moved to the left side of Officer Macomber. *Id*. ¶ 10. Officer Sery thought it was his responsibility to provide cover for Officer Macomber who would not be able to respond to a threat of deadly force while using the taser. *Id*. ¶¶ 9-10. From his new vantage point, Officer Sery "could see the driver digging furiously in his pocket." *Id*. Officer Sery also recalls shouting repeated warnings to the driver, telling him to "show me your hands, get your hands up." *Id*. Officer Sery pointed his gun at the driver and said, "Get your hands where we can see 'em." *Id*. ¶ 11. Instead of complying with the commands, the driver "kept looking over his shoulder at me and Officer Macomber as if he were acquiring us as a target." *Id*. ¶ 12.

Officer Sery claims he saw the driver shift in his seat and put his right hand in his right front jeans pocket as if he were digging for something. *Id*. ¶ 14. Officer Sery believed the driver

PAGE 6 - OPINION AND ORDER

was reaching into his pocket for a gun, so he yelled repeatedly at the driver, "I'm going to shoot. Get your hands out, I'm going to shoot." *Id.* It appeared as though the driver had trouble pulling his hand out of his pocket. *Id.* When the driver began to pull his hand out of his pocket, Officer Sery thought the hand appeared to be "clenched around something." *Id.* Officer Sery fired three shots at the driver who he believed "presented an immediate threat of death or serious physical injury" to Officer Sery or Officer Macomber. *Id.* ¶ 15.

After Officer Sery fired the shots, Officer Macomber saw movement from the driver's seat, specifically, the driver's left hand dropping towards his waist area. Macomber Aff. ¶ 21. The officers are trained to recognize the possibility that even a person who has suffered a fatal gunshot wound can still shoot and kill an officer before dying. *Id.* ¶ 21. Perceiving the driver's arm movement as a threat, Officer Macomber started tasing the driver continuously. *Id.* ¶ 22. Only one probe attached to Mr. Perez while the other probe became lodged in the driver's seat. *Id.* ¶ 22. There is no dispute that the taser was discharged for approximately three minutes. Forsyth Aff. ¶¶ 6-7.

B.    Plaintiffs' Version

Ascertaining the facts in deadly force cases "pose[s] a particularly difficult problem . . . because the officer defendant is often the only surviving eyewitness." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994), *overruled on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001). In this case, however, there were several witnesses. Contrary to the police officers' accounts, witnesses observed the officers "rushing" towards the white sedan (Tyler Inq. p 163:2-4) with weapons drawn (Leae Inq. p. 185:16-20; Pressler Inq. p. 39:9-16), yelling contradictory orders at the driver to both get out of the vehicle and put his hands on the wheel (Pressler Inq. p. 36:20;

Dennis Inq. p. 64:23 - 65:1; Sanchez Inq. p. 124:3-14; Leae Inq. p. 185:16-20).

Mr. Tyler parked at the mini-mart where he had come to buy a drink. Tyler Inq. p. 158:8. Standing ten feet from the passenger side of Mr. Perez's car, Mr. Tyler recalls that Mr. Perez opened his door and stuck one foot out on the ground to which one officer responded by yelling at Mr. Perez to get back in the car. *Id*. pp. 162:17 - 163:2. At that point, Mr. Tyler watched both officers "rush up to the car" with their pistols drawn. *Id*. p. 163:3-4. Mr. Tyler heard an officer shout "Get back, get back, I'm gonna shoot him." *Id*. p. 164:10-11.

Mr. Dennis, who pulled into the strip mall parking lot immediately after the police officers, observed the encounter and offered significant testimony at the Inquest Hearing.[3] According to Mr. Dennis, the driver's door was open, he could see what Mr. Perez was doing, and he recalled that "He . . . he's just sitting there with his hands like this.[4] He's just sitting in the car and it sounded like he said, you know, "What did I do[?]" or whatever." Dennis Inq. p. 64:14-17. Mr. Dennis heard the officers "barking orders" at the driver, with one officer saying "Get your hand on the wheel," and the other officer saying "Get out of the car." *Id*. p. 64:24 - 65:1. When asked to describe whether a struggle took place, Mr. Dennis answered there was no struggle, and he recalled that one officer tried to pull the driver out of the vehicle, but the driver was still locked in his seatbelt. *Id*. p. 66:2-5.

Another eyewitness, Ms. Leae, observed the incident from her position inside the strip

---

[3] Mr. Dennis apparently videotaped part of the incident, and the tape was played at the Inquest Hearing. Dennis Inq. p. 71:17. The court was not provided with a copy of this tape.

[4] There is no explanation in the Inquest Hearing transcripts of what Mr. Dennis meant by "like this," but in their brief, plaintiffs suggest that "like this" means that Mr. Perez's hands were in his lap. At oral argument, neither party could direct the court's attention to any evidence in the record regarding what motions Mr. Dennis used at the Inquest Hearing to illustrate what he meant by "like this."

mall laundromat.  At the Inquest Hearing, Ms. Leae recalled the driver put both his hands up in the air while asking the officers what he did wrong.  Leae Inq. p. 185:20, 186:22-25, 187:2-24.  She saw the driver turn to unbuckle his seatbelt with his left hand while his right hand was still raised.  *Id.* p. 187:23-25 - 188:1-5.  Additionally, Ms. Leae reported that the driver was not digging in his pocket or under the seat.  *Id.*

Officers Dauchy and Sothern were the first officers to arrive on the scene after the shooting.  Officer Dauchy saw Mr. Perez seated in the white sedan, hands shaking in his lap, and blood running down his shirt.  Dauchy Inq. p. 113:1-9.  The leads from the taser probes were going into the car.  *Id.* p. 111:8-10.  When he first ran onto the scene, Officer Dauchy started issuing verbal commands to the driver to "let me see your hands," and at that point, Officer Macomber said, "Aaron, I've been tasing him since shots have been fired."  *Id.* p. 112:8-11.  Officer Dauchy yelled at Officer Sery, "Does he have a gun?" to which Officer Sery responded, "I don't know, he's digging for his right side."  *Id.* p. 113:10-12.

Other witnesses remember the tasing occurring before the gunshots (Sundquist Inq. pp. 111:18 - 112:9-22) or simultaneously with the gunshots (Sanchez Inq. pp. 119:20 - 120:7; Pressler Inq. pp. 39:23 - 41:2).  Mr. Dennis described the tasing:

> ". . . the guy just leans on the taser.  Now on and on and on.  I mean there was one point - - a minute or better than that, I said "Hey, haven't you given enough yet?"  I mean at that point, I already knew the guy was dead, he had - - you know, he just kept stunning him and stunning him and stunning him and stunning him."

*Id.* p. 68: 3-10.

## II.    DISCUSSION

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Evaluating whether a genuine issue of material fact exists requires the court to view the record in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  If the movant initially shows that no genuine issue exists for trial, the non-movant cannot then rest on the pleadings but must respond with evidence setting "forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  When "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal quotations omitted).

### A.    Constitutionality of the Deadly Force Policy

Plaintiffs' motion for partial summary judgment requires the court to determine whether the City's policy governing a police officer's use of deadly force complies with constitutional standards as explicated by the federal courts.  Plaintiffs argue the City's policy is unconstitutional because rather than using the constitutionally correct "probable cause" standard, Portland Police General Order § 1010.10(a) allows officers to use deadly force if "they *reasonably believe*" the suspect poses an immediate threat of death or serious physical injury.  General Order § 1010.10 allows officers to use deadly force in the following circumstances:

> (a)    Members may use deadly force to protect themselves or others from what they reasonably believe to be an immediate threat of death or serious physical injury.
> (b)    A member may use deadly force to effect the capture or

PAGE 10 - OPINION AND ORDER

> prevent the escape of a suspect where the member has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the member or others.
>
> (c)     If feasible, some warning has been given.
>
> Members must be mindful of the risks inherent in employing deadly force.  A member's reckless or negligent use of deadly force is not justified in this policy or state statute.  Members are to be aware that this directive is more restrictive than state statutes.

Rosenthal Aff. Ex. 1, Portland Police Bureau ("PPB") General Order § 1010.10.

The seminal case on deadly force is *Tennessee v. Garner*, 471 U.S. 1 (1985).  In that case, the Supreme Court determined that "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."  *Id*. at 7.  The *Garner* decision marked a dramatic shift away from the common law rule allowing the use of deadly force to prevent the escape of all felony suspects.  *Id*. at 12-15.  With the Fourth Amendment providing the constitutional touchstone, the Court held "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.  *Id*. at 11.

Four years later in a non-deadly force case, the Supreme Court made "explicit what was implicit in *Garner*'s analysis" and held that "*all* claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard," rather than under the Fourteenth Amendment's substantive due process approach.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  The Fourth Amendment test of reasonableness "is not capable of precise definition," and instead requires an examination of the totality of the

PAGE 11 - OPINION AND ORDER

circumstances, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

In applying the principles announced in *Graham* and *Garner*, the Ninth Circuit has described the *Garner* test as "a more particularized version" of the Fourth Amendment's objective reasonableness analysis that applies in the deadly force context. *Blanford v. Sacramento County*, 406 F.3d 1110, 1115 (9th Cir. 2005); *see also Vera Cruz v. City of Escondido*, 139 F.3d 659, 661 (9th Cir. 1997) (describing *Garner* as establishing a "special rule" concerning deadly force), *overruled on other grounds by Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005); *Quintanilla v. City of Downey*, 84 F.3d 353, 357 (9th Cir. 1996) ("*Garner* and *Graham* set forth somewhat different standards for proving a Fourth Amendment excessive force violation.").

Relying on the Ninth Circuit formulations, plaintiffs argue that *Garner*'s particularized "probable cause" standard governs *all* deadly force cases. Thus, plaintiffs contend § 1010.10(a) of the City's policy on deadly force is unconstitutional because it allows officers to employ deadly force without the requisite probable cause. Defendants argue *Garner*'s "probable cause" standard applies only to a special subset of deadly force cases – those involving fleeing suspects. Defendants note the City's policy does require probable cause in the case of fleeing suspects. Further, defendants contend the cases relied upon by plaintiff are misleading because they quote *Garner* incompletely and therefore should not be read in such a way as to cast doubt on the constitutionality of the City's policy.

PAGE 12 - OPINION AND ORDER

The question then, for purposes of assessing the constitutional validity of the City's deadly force policy, is under what circumstances the Fourth Amendment's objective reasonableness test should incorporate *Garner*'s special rule of "probable cause." For the reasons stated below, I find the City's deadly force policy is constitutional. The *Garner* decision establishes a "probable cause" proof threshold that must be cleared before police may employ deadly force against a fleeing suspect rather than an attacking suspect. Subparts (a) and (b) of General Order § 1010.10 accurately reflect this distinction between fleeing versus attacking suspects. No Ninth Circuit case is inconsistent with this court's reading of *Garner*, and this is especially true when considering how these decisions applied the law to the facts.

1.    The *Garner* Decision

In *Garner*, the precise issue confronting the Court was "the constitutionality of the use of deadly force to prevent the escape of an apparently unarmed suspected felon." *Garner*, 471 U.S. at 3. The underlying facts involved a police officer responding to a reported burglary where he saw a fleeing suspect run through a backyard. *Id*. When the "young, slight, and unarmed" suspect began climbing a fence after being ordered to halt, the officer shot the suspect in the back of the head. *Id*. at 3-4, 21. Defendant police officer argued that because the suspect was a fleeing felon, Tennessee law permitted him to use any force necessary to capture the suspect. *Id*. at 4. The Tennessee statute on deadly force mirrored the common law standard and provided that "'[i]f, after notice of the intention to arrest the defendant, he either flee or forcibly resist, the officer may use all the necessary means to effect the arrest.'" *Id*. (quoting Tenn. Code. Ann. § 40-7-108 (1982)).

The Court held the Tennessee statute, though not unconstitutional on its face, "is

unconstitutional insofar as it authorizes the use of deadly force against such fleeing suspects."

*Id*. at 11. That is, against fleeing suspects who are "unarmed [and] nondangerous." However, the Court went on to say that the Tennessee statute would be constitutional as applied in the following circumstances:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon *or* there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id*. at 11-12 (emphasis added). This oft-quoted language from *Garner* deserves careful attention, especially where a district court is called upon to judge the constitutionality of an official policy governing how police effect the most intrusive of seizures. *See id*. at 9 ("The intrusiveness of a seizure by means of deadly force is unmatched."). The parties debate the applicability of the "probable cause" standard outside of the escape or fleeing suspect context described by *Garner*.

The extreme set of facts in *Garner* prompted the Court, at least in part, to reject the common law rule allowing the use of deadly force to prevent the escape of all felony suspects. Observing the young, slight and unarmed suspect trying to escape, police "could not have reasonably believed" the suspect posed any threat to themselves or others. *Id*. at 21. Faced with these facts, the Court described the Fourth Amendment balancing in this simple phrase: "It is not better that *all* felony suspects die than that they escape." *Id*. at 11. (emphasis added). Framing the balancing test in this manner, that is killing a suspect versus allowing the suspect to escape, it is clear that escape was a critical element in the Court's analysis.

PAGE 14 - OPINION AND ORDER

The importance of escape becomes more evident in light of the balance struck by the Fourth Amendment, the cornerstone of the *Garner* decision. "To determine the constitutionality of a seizure we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id*. at 8 (internal quotations and citation omitted). When police officers use deadly force against either fleeing or attacking suspects, the nature and quality of the intrusion on the individual's interest is the same, that is, an interest in life free from the most intrusive of government seizures. It is the other side of the balance, the importance of the governmental interests alleged to justify the intrusion, that differs between the fleeing suspect versus attacking suspect scenarios.

In the attacking suspect context, a police officer or other individual is the target of a threat that is immediate and close-up. Where a suspect is fleeing, on the other hand, the threat becomes more speculative and shifts to society at large. This difference, for Fourth Amendment purposes, is very significant. It makes sense, when a suspect is escaping, that something more than a mere suspicion of future dangerous is required on the government interest side of the scale to outweigh this extreme intrusion on the individual's interest. The Court recognized this when it stated, "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id*. at 11. Similarly, it makes sense to require less on the government interest side of the scale when a police officer faces an immediate danger to his life from an attacking suspect. Thus, the *Garner* decision should be read as setting a proof threshold that must be cleared before police may employ deadly force against a fleeing suspect rather than an attacking suspect. By requiring

the more demanding standard of probable cause in the fleeing suspect context, the Court effectively tipped the Fourth Amendment balance against allowing deadly force *to prevent the escape* of nondangerous suspects. *Id*. at 11-12.

        2.        Ninth Circuit Caselaw Interpreting *Garner* and *Graham*

The precedential meaning of *Garner* is somewhat adrift in a sea of Ninth Circuit cases concerning deadly force. This is not to say that these cases reach vastly divergent results. Rather, the caselaw dealing with deadly force does not incorporate a consistent written formula that would clearly dictate when the probable cause standard must appear in General Order § 1010.10(a). But when these cases are analyzed in light of the specific issue being addressed, a clearer pattern emerges. In analyzing whether a police officer's use of deadly force violates the Fourth Amendment, courts in the Ninth Circuit recite the objective reasonableness standard from *Graham*, often followed by a partial recitation of the *Garner* deadly force language. Although "probable cause" is included in the recitation of the *Garner* standard in cases not involving a fleeing suspect, this standard is neither central to, nor is it incorporated in, the application of the law to the facts. *See, e.g.*, *Billington v. Smith*, 292 F.3d 1177, 1184-85 (9th Cir. 2002) (reciting *Garner* probable cause test and then holding decedent's estate failed to establish a constitutional violation because, "[u]nder the circumstances, a reasonable officer would perceive" that the suspect posed a substantial risk of death or serious physical injury); *Figueroa v. Gates*, 207 F. Supp. 2d 1085 (C.D. Cal. 2002). At a minimum, none of the cases relied upon by plaintiffs compel the conclusion that without the words "probable cause" in § 1010.10(a), the City's policy is unconstitutional because it only requires probable cause as to fleeing suspects.

PAGE 16 - OPINION AND ORDER

In the first case plaintiffs cite, *Fikes v. Cleghorn*, 47 F.3d 1011 (9th Cir. 1995), the jury returned a verdict in favor of the arresting officers against whom plaintiff had filed claims for excessive use of force. Plaintiff appealed, arguing the district court erred in failing to give a jury instruction on the constitutional limitations on using deadly force. *Fikes*, 47 F.3d at 1014. The Ninth Circuit explicitly declined to reach that issue, however, because plaintiff failed to present any evidence that would support a claim that the officers actually used deadly force. *Id*. Nevertheless, plaintiffs here rely on footnote two from *Fikes*:

> While the use of "force" is reasonable under the Fourth [A]mendment if it would seem justified to a reasonable police officer in light of the surrounding circumstances, the use of "deadly force" is only justified if the officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

*Fikes*, 47 F.3d at 1014 n.2. Besides the incompleteness of this summary of *Garner*'s holding, the *Fikes* footnote is mere dicta on an issue the Ninth Circuit said it declined to reach, and does not control this court's analysis. *See United States v. Johnson*, 256 F.3d 895, 916 n.9 (9th Cir. 2001) (dicta should be measured based on whether a court intended to decide the issue, and where a circuit court panel "tells us it's not deciding the question, of course, we take it at its word").

Plaintiffs also rely on *Ting v. United States*, 927 F.2d 1504 (9th Cir. 1991). There, federal agents shot a suspect during an arrest when the suspect "lunged toward an unsecured enclosed dressing area . . . on the other side of the room." *Id*. at 1508. Like the pattern in many Ninth Circuit cases, the court described the *Graham* objective reasonableness test followed by the *Garner* deadly force standard requiring probable cause. *Id*. at 1509-10. Here, plaintiffs quote footnote three from *Ting*:

> The parties dispute the applicability of *Garner* as it involved the
> use of deadly force to prevent the escape of an unarmed, fleeing
> suspected felon. There is disagreement over whether Ting was
> attempting to escape or whether he was simply resisting arrest.
> We believe the Court's statements in *Garner* concerning the
> constitutionality of the use of deadly force are helpful under either
> scenario.

*Id.* at 1510 n.3.

To say, in a case addressing the constitutionality of federal agents' use of deadly force,

that the Supreme Court's statements about the constitutionality of using deadly force "are

helpful" is hardly remarkable. While this observation suggests the Ninth Circuit in *Ting*

discerned little difference between escape versus attack such that *Garner*'s probable cause

requirement applies in either context, the footnote does not conclusively answer the question

presented in this case of whether a formal policy requires the words "probable cause" in the latter

context. Moreover, helpful as the *Garner* statements might have been, the *Ting* decision never

once uses the words "probable cause" in its entire excessive force analysis. Therefore, the *Ting*

dicta in footnote three does not resolve the question confronting this court. *See United States v.

Crawley*, 837 F.2d 291, 292 (7th Cir. 1988) (defining dictum as "a general argument or

observation unnecessary to the decision").

Plaintiffs also cite *Brewer v. City of Napa*, 210 F.3d 1093 (9th Cir. 2000), another Ninth

Circuit case addressing the sufficiency of jury instructions on the use of force. Brewer alleged

excessive force through the City's use of police dogs and argued on appeal that the district court

erred by not instructing the jury that the arresting officers "did not have probable cause to

believe plaintiff was armed." *Id.* at 1097. The Ninth Circuit held that Mr. Brewer's claim lacked

merit because whether the arresting officers had probable cause to believe he was armed was not

PAGE 18 - OPINION AND ORDER

an issue before the jury. *Id*. After comparing the holdings of *Graham*, a non-deadly force case, and *Garner*, the court concluded that these two cases "make clear, the existence or absence of probable cause lacks relevance outside the deadly force context described by *Garner*." *Id*. at 1098. Thus, plaintiff's proposed *Garner* instruction was not appropriate because under Ninth Circuit precedent at the time, the use of police dogs did not constitute deadly force. *Id*.

Certainly, *Brewer* sheds light on the interplay of *Garner* and *Graham*. But in deciding this case, the impact of *Brewer* depends on how narrowly the court reads the phrase "the existence or absence of probable cause lacks relevance *outside the deadly force context described by Garner*." *Id*. (emphasis added). As discussed earlier, however, the *Garner* deadly force context includes the facts of that case – a fleeing and apparently unarmed suspect.

Three other Ninth Circuit cases cited by plaintiffs do not resolve the issue confronting this court. In *Monroe v. City of Phoenix*, the court held it was harmless error for the district court not to give a *Garner* deadly force jury instruction "in a police shooting case such as this." 248 F.3d 851, 860 (9th Cir. 2001). In *Saman v. Robbins*, the court concluded that the district court did not abuse its discretion by submitting to the jury a special verdict form asking whether the shooting officer had "probable cause to believe [the suspect] posed a threat of serious harm." 173 F.3d 1150, 1155 (9th Cir. 1999). In *Smith v. City of Hemet*, the Ninth Circuit seized the opportunity presented by a case involving a police dog to bring the circuit "into line with the others with respect to the *definition* of 'deadly force.'" 394 F.3d at 693. None of these cases addressed the constitutionality of a city's policy governing how and when police officers use deadly force.

Plaintiffs' most persuasive authority to support the proposition that probable cause is

required in all cases of deadly force, whether the suspect is fleeing or not, is *Scott v. Henrich*.  In

*Scott*, police officers received reports that a man was firing a gun in an apartment building.

39 F.3d at 914.  Police officers announced their presence and banged on the street level door.  *Id.*

The door opened and there stood the suspect wielding a gun pointed directly at the officers.  *Id.*

After one police officer fired at the suspect, a different officer, mistakenly believing that the

suspect had fired first, shot and killed the suspect.  *Id.*  Not even under a generous interpretation

of these facts could *Scott* be construed as a fleeing suspect case.  Nevertheless, the court

articulated the *Garner* test as the appropriate standard to measure the constitutionality of the

police officer's use of deadly force in this scenario: "An officer's use of *deadly* force is

reasonable only if 'the officer has probable cause to believe that the suspect poses a significant

threat of death or serious physical injury to the officer or others.'"  *Id.* (quoting *Garner*, 471 U.S.

at 3).

Reading the constitutional standard as enunciated by *Scott* would seem to require that

*Garner*'s probable cause test be applied in the broad universe of all deadly force cases, not just

those involving fleeing suspects.  However, I am not persuaded that *Scott* requires me to find the

City's policy unconstitutional.  First, *Scott* provides only a partial quote from *Garner*'s language

in what is merely a passing reference to the legal standards governing claims of excessive use of

force.  Second, in applying the law to the facts, the *Scott* decision actually uses an objective

reasonableness standard.  This is evidenced by the fact that the court uses the words "reasonable"

or "objectively reasonable" at least three times at critical junctures in the analysis while the

words "probable cause" are notably absent.  *See id.* at 915-16.  Thus, a reading of the entire *Scott*

decision shows that it is consistent with this court's reading of *Garner* and *Graham*.  In sum,

PAGE 20 - OPINION AND ORDER

*Scott* does not compel the conclusion advanced by plaintiffs.[5]

Defendants rely on *Blanford v. Sacramento County* to counter plaintiffs' list of Ninth Circuit caselaw. In *Blanford*, the Ninth Circuit's most recent pronouncement on the use of deadly force, police officers shot a man armed with a sword who refused to heed repeated warnings and appeared intent on trying to gain access to a private residence. *Blanford*, 406 F.3d at 1119. Not surprisingly, the court set the scene for the analysis by reciting the *Graham* standard for excessive force followed by *Garner*'s "more particularized version of the Fourth Amendment's objective reasonableness analysis for assessing the reasonableness of deadly force." *Id*. at 1115. The *Blanford* articulation of the constitutional standards quotes *Garner* more completely and, unlike several other Ninth Circuit cases, it includes what I read to be a critical phrase: "to prevent escape." *Id*.

> "[W]hile it is unreasonable to apprehend an unarmed, nondangerous suspect by killing him, an officer's use of deadly force to prevent escape satisfies Fourth Amendment standards '[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'"

---

[5] It is worth noting that Judge Kozinski, the author of *Scott*, articulated a different formulation of the *Garner* standard in a subsequent decision:

> Law enforcement agents may use deadly force only if they *reasonably believe* that killing a suspect is necessary to prevent him from causing immediate physical harm to the agents or others, or to keep him from escaping to an area where he is likely to cause physical harm in the future. Even then, deadly force may not be deployed until the suspect has been given a warning and an opportunity to surrender, unless giving a warning will materially increase the risk of bodily injury or escape.

*See Idaho v. Horiuchi*, 253 F.3d 359, 367 (9th Cir. 2001) (en banc) (emphasis added), *vacated as moot by Idaho v. Horiuchi*, 266 F.3d 979 (9th Cir. 2001).

PAGE 21 - OPINION AND ORDER

*Id.* (quoting *Garner*, 471 U.S. at 11). Turning to the court's application of the *Garner* standard, the court found the officer's use of deadly force constitutional because a "*reasonable officer* in his position would have *believed* that doing so was necessary to neutralize the threat that [the suspect] posed to people on the premises." *Id.* at 1118 (emphasis added). Although *Blanford* provides some guidance on current Ninth Circuit thinking, it leaves room for uncertainty, and does not reach, much less resolve, the issue in this case.

None of the previously discussed cases deal specifically with the constitutionality of a formal written policy on the use of deadly force. Certainly, their discussion of *Garner* and *Graham* aids my analysis, but I believe it is appropriate to limit their guidance to evaluating the constitutionality of an officer's conduct in specific factual circumstances. Whether a particular set of facts constitutes an unconstitutional use of deadly force is case-specific. *Brosseau v. Haugen*, 543 U.S. 194, ___, 125 S. Ct. 596, 599 (2004) ("[T]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.") (quoting *Saucier*, 533 U.S. at 206). Here, in contrast, the court is called upon to decide the constitutionality of a written policy. To that end, this court finds particularly instructive the case of *Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997).[6]

There, plaintiff Harris suffered gunshot wounds inflicted by FBI officers during the now infamous standoff at Ruby Ridge. Plaintiff filed a *Bivens* suit alleging the FBI's policy on deadly force, crafted specifically for the Ruby Ridge incident, permitted the unconstitutional use of

---

[6] In *Harris*, the Ninth Circuit used an analytical framework for evaluating qualified immunity that does not comport with the Supreme Court's subsequent opinion in *Saucier*. Nevertheless, the Ninth Circuit's discussion of the constitutional limitations on deadly force as expounded by *Garner* and *Graham* is still valid law and provides the most on-point precedent for this court's analysis.

PAGE 22 - OPINION AND ORDER

deadly force. *Id*. at 1201. These Special Rules of Engagement ("Special Rules") required FBI agents to "kill any armed adult male observed near the Weaver residence, irrespective of whether the armed adult presented an immediate threat of harm to the agent or to another person." *Id*. at 1200. In contrast, the FBI's Regular Rules of Engagement ("Regular Rules") permitted agents to use deadly force "only when the person presents an immediate risk of death or great bodily harm to the agent or another person." *Id*. at 1193.

Like the issue in this case, the court in *Harris* was called upon to decide whether a formal policy permitted an unconstitutional use of deadly force. *Id*. at 1201. After reciting the *Graham* and *Garner* standards, the Ninth Circuit described certain principles that are clearly established under this line of deadly force cases. One of these principles is the idea that "[l]aw enforcement officers may not shoot to kill, unless, at a minimum, the suspect presents an immediate threat to the officer or others, or is fleeing and his escape will result in a serious threat of injury to persons." *Id*. (citing *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991)). The court thus recognized the distinction between fleeing and non-fleeing suspects. The court also recognized that deadly force must be predicated on an immediate threat, either to the officers or others.

In light of these principles, the court concluded "[i]t is clear that the Special Rules . . . mandated an unconstitutional use of force" because they "instructed the officers that they could and should kill any adult male armed with a weapon in the vicinity of the Weaver cabin, regardless of whether he was threatening the officers or any other persons." *Id*. at 1202. On the other hand, the Regular Rules limited an agent's permissible use of deadly force to those situations where the suspect poses an immediate risk of death or great bodily harm to the agent

PAGE 23 - OPINION AND ORDER

or another person, and, as such, the Regular Rules were "clearly designed to comply with the requirements of the Constitution as explicated by the federal courts." *Id.* Significantly, the Regular Rules did not contain a probable cause requirement, and nowhere in *Harris* is there any suggestion that probable cause is always required in any deadly force case. Therefore, the *Harris* decision, with its comparison of two policies on deadly force, one constitutional and the other unconstitutional, provides a roadmap for assessing the constitutional validity of the City's deadly force policy.

The City's policy on deadly force does not authorize the use of deadly force to prevent the escape of all felony suspects as did the Tennessee statute at issue in *Garner*, nor does the City's policy allow police to shoot "any armed adult male" irrespective of whether he poses a threat. Instead, General Order § 1010.10(b) allows an officer to use deadly force to prevent a suspect's escape only where the officer has probable cause to believe the suspect poses a significant threat of death or serious bodily injury to the officer or others. Section 1010.10(b) tracks the *Garner* standard applicable in the fleeing suspect context, and it is constitutional. General Order § 1010.10(a) allows officers, in a non-escape context, to use deadly force to protect themselves or others from what they reasonably believe to be an immediate threat of death or serious physical injury. Though it does not require "probable cause," General Order § 1010.10(a) closely tracks the language in the FBI's Regular Rules, language the Ninth Circuit held clearly complied with constitutional requirements.

3.      Conclusion

The City's deadly force policy is constitutional as it comports with the standards governing a police officer's use of deadly force announced by the Supreme Court in *Graham* and

PAGE 24 - OPINION AND ORDER

*Garner*. Though some Ninth Circuit cases cite an incomplete version of *Garner*'s standard on deadly force, the Ninth Circuit has never broken away from the *Graham* and *Garner* framework when applying law to the facts. Moreover, when the Ninth Circuit addressed the constitutionality of a written policy on deadly force, it found the FBI's Regular Rules to comport with constitutional demands even though they did not require "probable cause." Therefore, I find the City's policy on deadly force complies with constitutional standards.

B.      Qualified Immunity

Defendant police officers move for summary judgment on the grounds that they are entitled to qualified immunity on plaintiffs' claims of excessive use of force in violation of the Fourth Amendment. The officers' entitlement to qualified immunity must be evaluated under a two-part inquiry. *Saucier*, 533 U.S. at 201. The first issue is whether, in the light most favorable to the party asserting the injury, the facts show that the officers' conduct violated a constitutional right. *Id*. If the answer to the first question is no, then the officers are entitled to qualified immunity. *Id*. On the other hand, if the answer is yes, then the court asks a second question, whether the right violated was "clearly established." *Id*. The second inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau*, 125 S. Ct. at 599 (quoting *Saucier*, 533 U.S. at 201).

1.      Officer Sery's Use of Deadly Force

(a)      Whether Officer Sery Violated a Constitutional Right

Under the Fourth Amendment, police may use only such force as is objectively reasonable under the circumstances. *See Graham*, 490 U.S. at 397. Determining whether an officer's conduct is objectively reasonable requires an examination of the totality of the

PAGE 25 - OPINION AND ORDER

circumstances, including "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396.

Taken in the light most favorable to plaintiffs, there are material questions of fact concerning whether Mr. Perez posed a threat of serious physical harm to the officers or others that would have justified the use of deadly force. For purposes of defendants' motion for summary judgment, I cannot accept Officer Sery's version of the facts in which Mr. Perez was "digging furiously in his pocket" and withdrew his hand clenched around something. Sery Aff. ¶¶ 9-10, 14. In plaintiffs' version, which I must accept for purposes of this analysis, Mr. Perez's hands were raised, he was not reaching for a weapon nor was he digging in his pockets. Leae Inq. p. 187:23-25 - 188:1-5. After officers ordered him to exit his vehicle, Mr. Perez used his left hand to unbuckle his seatbelt while he kept his right hand raised in the air. *Id*. On the facts alleged by plaintiffs, Mr. Perez did not pose an immediate threat of death or serious bodily injury to Officer Sery or others because Mr. Perez was not reaching for a weapon, was not digging in his pocket, and was trying to unbuckle his seatbelt. *See Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005) (holding that plaintiff's facts alleged a violation of the Fourth Amendment because after he was ordered to exit the cabinet in which he was hiding, his "mere action of moving his arm to grab the top of the cabinet would not cause a reasonable officer to perceive a serious threat of physical harm to himself or others"). Plaintiffs have put forth facts on which a reasonable jury could find that Officer Sery violated Mr. Perez's Fourth Amendment rights.

(b) Whether the Right Violated Was "Clearly Established"

In step two of the qualified immunity analysis, the court must evaluate whether "the

PAGE 26 - OPINION AND ORDER

contours of the right . . . [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202 (internal quotations and citation omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. Because the step two inquiry focuses on "whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau*, 125 S. Ct. at 599.

      The Supreme Court recently evaluated, in step two of the qualified immunity analysis, the degree to which *Garner* and *Graham* provided fair notice in a case involving a police officer's use of deadly force to apprehend a suspect fleeing in a vehicle. *Id*. at 598-600. There, the Ninth Circuit found the shooting officer was not entitled to qualified immunity because the *Graham* and *Garner* tests provided fair warning that her use of deadly force was unconstitutional. *Id*. at 599. The Supreme Court reversed and cautioned lower courts that *Graham* and *Garner* are, like the text of the Fourth Amendment, "cast at a high level of generality." *Id*. at 599. At the same time, the Court indicated that "in an obvious case, these standards can 'clearly establish' the answer." *Id*. The facts in *Brosseau*, however, distinguished it from the "obvious case" where *Garner* and *Graham* can be said to provide fair notice. In the specific situation confronting Officer Brosseau, that is, "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight," the Court held it was not clearly established that using deadly force violated the Fourth Amendment. *Id*. at 600. Therefore, the step two analysis here will depend on whether this is an "obvious case" for which Officer Sery was on fair notice that his use of deadly force

PAGE 27 - OPINION AND ORDER

violated the Constitution.

Viewing the facts in the light most favorable to plaintiffs, Officer Sery shot an unarmed man, whose arms were raised above his head while he was still seatbelted in his car and who committed a minor traffic violation. These facts seem to fit the mold of that "obvious case" to which *Garner*'s twenty-year-old pronouncement would provide fair notice; in other words, a reasonable officer in Officer Sery's situation would understand that it is unconstitutional to "seize an unarmed, nondangerous suspect by shooting him dead." *Garner*, 471 U.S. at 11. Indeed, "[c]ourts have repeatedly held that excessive force defendants are not entitled to qualified immunity in cases where decedents did not have weapons on their persons, brandish weapons, or threaten to use them-even if the officers believed the decedents were armed." *Figueroa*, 207 F. Supp. 2d at 1093 (citing *Harris*, 126 F.3d at 1203). Officer Sery's actions, unlike the shooting officer in *Brosseau*, cannot be characterized as falling in the "hazy border between excessive and acceptable force." *Saucier*, 533 U.S. at 206 (internal quotations and citation omitted). In *Brosseau,* even after construing the facts in the light most favorable to the suspect, the Court described the suspect as someone who "had proven he would do almost anything to avoid capture and that he posed a major threat to, among others, the officers at the end of the street." *Brosseau*, 125 S. Ct. at 600 (internal quotations omitted). The same cannot be said of Mr. Perez. Accepting plaintiffs' version of the facts for purposes of this motion, I conclude Officer Sery could not have reasonably believed that using deadly force in this situation was lawful.

PAGE 28 - OPINION AND ORDER

2.      Officer Macomber's Use of the Taser

(a)      Whether Officer Macomber Violated a Constitutional Right

As an initial matter, defendants argue Officer Macomber's use of the taser was not a "seizure" because the tasing was ineffective due to the fact that both probes did not attach to Mr. Perez. *See United States v. Hernandez*, 27 F.3d 1403 (9th Cir. 1994) (holding a physical force seizure does not occur if an officer applies physical force that is ineffective).  The efficacy of the tasing is in dispute,[7] and on defendants' motion for summary judgment, I must view all facts in the light most favorable to plaintiffs.  Therefore, I will assume the tasing was an effective application of force subject to the Fourth Amendment.

Again, all claims of excessive force, whether deadly or not, should be analyzed under the Fourth Amendment's objective reasonableness standard.  *Blanford*, 406 F.3d at 1115.  In conducting this balancing test, a court must consider the totality of the facts and circumstances in the situation confronting Officer Macomber.  *Id*.  On the first factor in the *Graham* balance, the severity of the crime at issue, officers stopped Mr. Perez based on a minor traffic infraction.  On the remaining two factors, viewed in the light most favorable to plaintiffs, the facts show that Mr. Perez did not pose an immediate threat to the officers or others, nor was he resisting arrest.  Leae Inq. p. 187:23-25 - 188:1-5; Dennis Inq. p. 66:4-5.  Even though Mr. Perez appeared to be totally incapacitated, Officer Macomber continued tasing him despite the protestations of onlookers.  Dennis Inq. p. 68:3-10.  Under these circumstances, a jury could find that tasing

---

[7] Officer Dauchy arrived on scene immediately after the shooting and saw the tasing strip attached to Mr. Perez and Mr. Perez's hands shaking.  Officer Macomber's Inquest testimony also suggests that he felt the tasing was effective, given that Mr. Perez was visibly jerking.  Finally, Mr. Forsyth testified at the inquest that even if only one probe attached, the taser would still be capable of delivering intermittent electrical shocks.

Mr. Perez continuously for three minutes was objectively unreasonable. Therefore, because the facts, viewed in the light most favorable to plaintiffs, show that Officer Macomber's use of the taser violated Mr. Perez's Fourth Amendment right to be free from excessive force, Officer Macomber is not entitled to qualified immunity at this step in the analysis.

(b)     Whether the Right Violated Was "Clearly Established"

Under plaintiffs' version of events, the facts indicate that Officer Macomber tased an incapacitated and unarmed man, whose arms were raised above his head and who remained seatbelted in his car. Of course, federal courts have recognized that the making of "an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. However, in the specific context of this case, it would be clear to a reasonable officer that tasing for three minutes an incapacitated and unarmed man who was still seated in his vehicle with his arms raised was an unlawful use of force. Therefore, Officer Macomber is not entitled to qualified immunity at summary judgment.

C.     Plaintiff's Motion for Summary Judgment Regarding the Officers'
Unconstitutional Use of Deadly Force

Plaintiffs move the court to enter partial summary judgment in their favor based upon a finding that Officer Sery unconstitutionally used deadly force against Mr. Perez when Officer Sery did not have probable cause to believe that Mr. Perez posed an immediate and serious threat of death or serious physical injury to either officer. This portion of plaintiffs' motion presents the court with the converse of defendants' motion of summary judgment based on qualified immunity, step one, whether Officer Sery violated a constitutional right. Given the disputed issues of material fact regarding what transpired in the twenty-four seconds preceding Mr. Perez's death, summary judgment in favor of plaintiffs is also inappropriate.

PAGE 30 - OPINION AND ORDER

Viewing the facts in the light most favorable to the non-movant defendants, Mr. Perez resisted arrest and acted uncooperatively. Officer Sery observed his partner reach inside the vehicle and grab Mr. Perez's arm, but Mr. Perez broke free. Next, Officer Sery saw Mr. Perez "digging furiously in his pocket" despite repeated orders to make his hands visible. Mr. Perez also refused to heed Officer Sery's commands and kept looking back at the police officers in an attempt to acquire the officers as targets. When Mr. Perez began to pull his hand out of his pocket, Officer Sery saw that the hand was "clenched around something" and this is when he made the split-second decision to shoot Mr. Perez. Under these facts, a reasonable officer could perceive Mr. Perez as posing an immediate risk of death or serious injury. *See, e.g.*, *Billington*, 292 F.3d at 1185 (holding that where a suspect actively resisted arrest and attempted to turn the officer's weapon against him, a reasonable officer would perceive that the suspect posed a substantial risk of death or serious injury); *Monroe*, 248 F.3d at 862 (holding that a reasonable jury could assess an officer's split second judgment to use deadly force and conclude the officer "had probable cause to believe the suspect posed a threat of serious physical harm even though he did not actually have a weapon in his hand when [the officer] shot him."); *Reese v. Anderson*, 926 F.2d 494, 500-01 (5th Cir. 1991) (holding that an officer would have "probable cause to believe that the suspect pose[d] a threat of serious physical harm" where the suspect in a vehicle repeatedly reached for an unknown object in defiance of the officer's order to raise his hands). Therefore, viewing the facts in the light most favorable to defendants, it would be inappropriate to grant plaintiffs' motion for summary judgment on the grounds that Officer Sery violated the Fourth Amendment.

PAGE 31 - OPINION AND ORDER

D.      Municipal Liability

In *Monell v. Department of Social Services of the City of New York*, the Supreme Court

held that municipalities are "persons" subject to damages liability under section 1983 where

"action pursuant to official municipal policy of some nature cause[s] a constitutional tort."

436 U.S. 658, 691 (1978).  A city may not be held vicariously liable for the unconstitutional acts

of its employees under a theory of respondeat superior, but the city may be liable where the

constitutional violation is a direct result of the city's policy or custom.  *Id.*; *City of Canton v.*

*Harris*, 489 U.S. 378, 385 (1989).  A plaintiff establishes municipal liability by demonstrating:

(1) "a longstanding practice or custom which constitutes the standard operating procedure of the

local government entity;" (2) the individual who committed the constitutional tort was an official

with "final policymaking authority" such that the challenged action itself constituted an act of

official municipal policy; or (3) an official with final policy-making authority ratified the

unconstitutional decision of a subordinate.  *Ulrich v. City & County of San Francisco*, 308 F.3d

968, 984-85 (9th Cir. 2002) (internal quotations and citations omitted).

Plaintiffs claim Mr. Perez's constitutional rights were violated as a result of (1) the City's

official policy on deadly force, (2) the City's custom or failing to discipline officers and/or

ratifying the conduct of officers who use deadly force unconstitutionally, and (3) the City's

custom of failing to train officers regarding the constitutional limitations on using deadly force.

Defendants move for summary judgment on all three of these bases for *Monell* liability.

1.      Official Policy

The City's policy governing a police officer's use of deadly force, General Order

§ 1010.10, is constitutional.  *See supra*, Part II.A.  Therefore, defendants' motion for summary

PAGE 32 - OPINION AND ORDER

judgment is granted on this ground of municipal liability

2.      Failure to Discipline

Plaintiffs claim the City has a policy, practice, or custom of failing to discipline police officers who use deadly force without probable cause. Specifically, plaintiffs assert "no Portland Police officer has ever been disciplined for shooting at an unarmed citizen in the last 20 years." Pl.s' Resp. Mem. Opp. Summ. J. at 20. Plaintiffs find support for this argument in the report issued by the Police Assessment Resource Center ("PARC") after it reviewed incidents involving officers shooting citizens during a three-year period from 1997-2000. In addition, plaintiffs rely on Dr. Streed, an expert in police procedures, tactics, and training, who reviewed "incomplete reports" of thirty police shootings in the past twenty years by Portland police officers. Streed Decl. ¶ 19. Dr. Streed opined that at least fifteen of these shootings "were not based on probable cause." Streed Decl. ¶ 19. Finally, at oral argument, plaintiffs offered an alternative argument that even if the PPB has attempted to impose discipline on officers who use excessive force, such attempts ultimately proved unsuccessful in arbitration and thus constitute a failure to discipline.

Defendants respond to plaintiffs' failure to discipline argument by offering several examples of the PPB disciplining officers for use of excessive and/or deadly force. Foxworth Second Aff. ¶¶ 3-5 (filed under seal). First, Chief Foxworth demoted at least one officer due to his inappropriate discharge of a firearm at a fleeing suspect. Second, under Chief Kroeker, the PPB suspended an officer for unsatisfactory performance during the shooting of a citizen. Third, under Chief Moose, the PPB terminated an officer who, in contravention of City policy, repeatedly discharged his firearm at a fleeing suspect.

I find the City is not subject to *Monell* liability on the failure to discipline and/or

PAGE 33 - OPINION AND ORDER

ratification theories advanced by plaintiffs. Plaintiffs' argument that the City never disciplined an officer who used deadly force without having the requisite probable cause is based on a faulty premise because it overstates the relevant standard. Dr. Streed's conclusions to this effect, even if accepted as expert testimony, are largely irrelevant because his analysis proceeded under the assumption that all deadly force cases, regardless of the circumstances, require probable cause. By gathering their record evidence based on this faulty assumption, plaintiffs failed to supplant the record with facts that would be relevant to the court's inquiry. Plaintiffs' failure results in the absence of a genuine issue of material fact on this record. Under the City's deadly force policy, a policy that I find comports with constitutional standards, the record reflects that several officers have been disciplined for their unlawful use of deadly force. Foxworth Second Aff. ¶¶ 3-5 (filed under seal). As to plaintiffs' assertion at oral argument regarding PPB's failure to discipline officers "successfully" due to arbitrator decisions exonerating the officers, I am unwilling to attribute to the City a failure to discipline where the City made attempts to discipline but the arbitration process produced different results. Moreover, plaintiffs failed to include in the record evidence of disciplinary actions imposed by the City and later overturned by arbitration. In other words, based on this record, no rational juror could find there has been a failure to discipline Portland police officers who unconstitutionally use deadly force.

>    3.    Failure to Train

The "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton*, 489 U.S. at 388. In *Canton*, the Court established three facts the plaintiff must prove to succeed on a failure to train theory: (1) that a training program is

PAGE 34 - OPINION AND ORDER

inadequate to the tasks that officers must perform, (2) that the inadequacy is the result of the City's deliberate indifference, and (3) that the inadequacy is "closely related to" or "actually caused" the plaintiff's injury. *Id*. at 390-91. Plaintiff cannot succeed by showing merely that "an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." *Id*. at 391.

Plaintiffs' main argument under the failure to train theory is that the City trains officers to use deadly force pursuant to an unconstitutional policy. This court has already found that policy constitutional. Thus, a major underpinning of plaintiffs' argument for failure to train is missing, and much of plaintiffs' argument is unavailing.

Once the policy is deemed constitutional, very little of plaintiffs' failure to train argument remains. The affidavit of Dr. Streed, for example, rests in large part on the premise that training occurs under an unconstitutional policy. If his reliance on an unconstitutional policy is excised from his opinion, Dr. Steed has little to offer. He does not, for example, assert that any training occurs that is inconsistent with the policy. He does not assert that the City fails to train its officers about the policy. Nor does he, or any other witness, contradict the City's description of how it trains its officers. It is, therefore, undisputed that the City trains its officers according to a constitutional policy.

In fact, it may not be possible to view any of Dr. Streed's opinions about training as entirely independent of his assumption that the policy is unconstitutional. But even if that can be done, they are not so much fact-based assertions but characterizations: the training scenarios are "no win" and teach officers to "shoot first and ask questions later." These characterizations, which are not grounded in any specific flaw in the training, are simply insufficient to show the

City made "a 'deliberate' or 'conscious' choice in this respect, knowing that their failure to do so would 'likely . . . result in the violation of constitutional rights.'" *Ting*, 927 F.2d at 1512 (quoting in part *Canton*, 489 U.S. at 388).

This is not to say the training is ideal. But the Supreme Court made clear in *Canton* that a plaintiff cannot make a city liable for failure to train just by showing ways in which training could be improved. 489 U.S. at 391. Here, plaintiffs put almost all their eggs in one basket -- the argument that the policy is unconstitutional. Without that, the most they can say is that the training hypersensitizes officers to their chances of getting shot. But they do not show that the training has led to shootings that violate civil rights, to a degree that the City would be on notice that its training was defective under *Canton*. They assert a number of shootings have been without probable cause, but this court's ruling has made that point largely irrelevant. And it is manifestly not before this court whether the training does anything more than satisfy the standard in *Canton* and its progeny.

E.      Unlawful Traffic Stop

Plaintiffs' claim alleging an unlawful traffic stop is properly analyzed under the Fourth Amendment, and their claim that Mr. Perez was targeted by the officers because of his race is properly analyzed under the Equal Protection clause of the Fourteenth Amendment.

1.      Fourth Amendment Analysis

Under the Fourth Amendment, a traffic stop constitutes a seizure, and must not be "unreasonable." *See Whren v. United States*, 517 U.S. 806, 810 (1996). In general, an officer's decision to stop an automobile is reasonable where the officer has "probable cause to believe that a traffic violation has occurred." *Id.* The constitutional reasonableness of a traffic stop does not

depend upon the subjective motivations of the officers involved.  *Id*. at 813.  Officers Macomber

and Sery saw Mr. Perez commit a traffic violation in failing to properly signal his right turn.

Based upon this observation, the officers had probable cause to temporarily detain Mr. Perez,

and such detention does not violate the Fourth Amendment prohibition against unreasonable

seizures.  Therefore, defendants' motion for summary judgment on this claim is granted.

### 2.     Fourteenth Amendment Analysis

In order to establish the Equal Protection claim, plaintiffs must show the officers "'acted

in a discriminatory manner, and that the discrimination was intentional.'"  *Bingham v. City of

Manhattan Beach*, 341 F.3d 939, 948 (9th Cir. 2003) (citing *Reese v. Jefferson Sch. Dist.

No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000)).  In order to survive summary judgment, plaintiffs

"'must produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance

of the evidence that [the] decision . . . was racially motivated.'"  *Id*. at 949 (alterations in

original) (citing *Kayser v. Sacramento City Unified Sch. Dist*., 265 F.3d 741, 754 (9th Cir.

2001)).  Discriminatory intent may be proved by direct or circumstantial evidence.  *FDIC v.

Henderson*, 940 F.2d 465, 471 (9th Cir. 1991).  To decide whether a genuine issue of material

fact exists in this equal protection claim, this court must examine the evidence supporting

plaintiffs' prima facie case, evidence of the defendants' legitimate, nondiscriminatory motives,

and any additional evidence offered by plaintiffs to rebut those motives.  *Wallis v. J.R. Simplot,

Co*., 26 F.3d 885, 890 (9th Cir. 1994).

Plaintiffs argue they have presented circumstantial evidence giving rise to a question of

material fact as to whether Officers Macomber and Sery performed a pretext stop of Mr. Perez

because he is an African American.  In support of this argument, plaintiffs offer (1) statistics

showing that African Americans are subject to traffic stops at approximately twice the rate of their representation in the population, and (2) evidence that Officers Macomber and Sery were involved in an allegedly discriminatory confrontation with an African American man fifteen minutes prior to the traffic stop with Mr. Perez. Pl.s' Resp. Mem. Opp. Summ. J. at 30-31. Defendants counter plaintiffs' showing with several legitimate reasons justifying this traffic stop including Mr. Perez's violation of traffic law, the reasonable suspicion raised by the car's after market additions, the fact that the car seemed out of place, the nervous appearance of the passengers, the fact that the number of occupants in the car decreased from two to one, and the discrepancy between the age of the registered owner and that of the driver.

Plaintiffs' statistical showing of a disparity in stops compared to percentage of population is insufficient to establish that defendants' decision to effect a traffic stop was racially motivated. *See e.g., McCleskey v. Kemp*, 481 U.S. 279, 293 n.12 (1987) (only in "rare cases [has] a statistical pattern of discriminatory impact demonstrated a constitutional violation"); *Anderson v. Carnejo*, 355 F.3d 1021, 1024 (7th Cir. 2004) (airport searches "designed to catch smugglers comport with the Constitution even if they produce a disparate impact."); *Chavez v. Ill. State Police*, 251 F.3d 612, 647-48 (7th Cir. 2001) (declining to rely on statistical showing of disparate impact in traffic stops to show police officers engaged in racial profiling). Plaintiffs' statistics do not reveal what percentage of these traffic stops successfully uncovered criminal activity, nor do they account for factors, other than racial discrimination, that could result in a disparate impact. More fundamentally, plaintiffs' statistics reflect the behavior of the entire police bureau. But this claim is based on purposeful discrimination by these two individual officers. Bureau-wide statistics tell us very little about the discriminatory intent of any individual officer. I am

PAGE 38 - OPINION AND ORDER

unwilling to find that plaintiffs made a showing of purposeful discrimination based on statistical data that fails to control for such relevant factors or motivations.

Plaintiffs' non-statistical evidence of a previous altercation with an African American male, even considered in conjunction with the statistical showing, is also insufficient to rebut defendants' legitimate and non-discriminatory reasons for stopping Mr. Perez. With respect to the previous encounter, the record shows Officers Sery and Macomber engaged in a brief investigatory stop of an African American male because they were searching for a suspect based on specific information including race, name, and type of vehicle. Janssen Decl. ¶¶ 4-5. Although race alone may not justify an investigatory stop, it may serve as a relevant factor, particularly where the citizen information that prompted the police action listed the suspect's race. *United States v. Brignoni-Ponce*, 422 U.S. 873, 886-887 (1975). In sum, plaintiffs have failed to come forward with evidence that would permit a reasonable trier of fact to find by a preponderance of the evidence that this traffic stop was racially motivated. Therefore, defendants' motion for summary judgment on this claim is granted.

F.      State Law Claim for Negligence

Finally, defendants move for summary judgment against plaintiffs' Fourth Claim for Relief, a state law claim for wrongful death based on the negligence of Officer Sery, Officer Macomber and the City. Defendants contend that under the Oregon Tort Claims Act ("OTCA"), the City is the only proper defendant in actions based on the alleged torts of a public body or its employees, officers or agents acting "within the scope of their employment or duties." Or. Rev. Stat. § 30.265. Plaintiffs do not allege Officers Sery or Macomber were acting outside the scope of their employment. Thus, under the OTCA, I grant defendants motion for summary judgment

as to Officers Sery and Macomber, and the City is substituted as the only proper defendant on this state law claim.

Defendants fail to articulate why summary judgment should be granted in the City's favor on plaintiffs' negligence claim. Instead, defendants assert "[p]laintiffs cannot prevail on these allegations of negligence in light of defendants' proof in their summary judgment motion" that defendant Officers acted lawfully and there are no facts to support the ratification or training claims against the City. Def.s' Mem. Supp. Summ. J. at 22. Defendants seem to argue that because summary judgment is warranted in their favor on the constitutional issues, summary judgment in their favor is necessarily appropriate on the negligence issue as well. This argument fails because summary judgment is not warranted in defendants' favor on plaintiffs' claims for excessive use of force. Moreover, the state law claim and the constitutional claims are distinct bases for recovery. *See, e.g., Bailey v. County of Riverside*, 414 F.3d 1023 (9th Cir. 2005) (upholding jury verdict awarding damages for both negligence and excessive force of arresting officers). Defendants have not described the proper standards governing a claim of negligence, nor have they shown the absence of a genuine issue of material fact on the elements constituting negligence. Therefore, I deny defendant City's motion for summary judgment on this claim.

III.     CONCLUSION

Plaintiffs' motion (#89) for partial summary judgment is DENIED because I find that General Order §1010.10 complies with the constitutional standards regarding the use of deadly force as explicated by the federal courts. Plaintiffs' motion (#89) is also DENIED to the extent that it asks the court to find that Officer Sery violated the Fourth Amendment because there are genuine issues of material fact that preclude summary judgment in favor of plaintiffs.

Defendants' motion (#123) for summary judgment is GRANTED IN PART and DENIED

IN PART.  The motion is DENIED with respect to the individual officers' entitlement to

qualified immunity, and the City's negligence.   The motion is GRANTED with respect to each

of plaintiffs' asserted grounds of *Monell* liability, the legality of the traffic stop, and the

negligence claim against the individual officers.

IT IS SO ORDERED.

DATED this ___10th___ day of January, 2006.


                             /s/ Michael W. Mosman
                             MICHAEL W. MOSMAN
                             United States District Judge